UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANGRY CHICKZ, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOSPHORUS TRADE, INC., et al., <br><br> Defendants. | Case No. 23-cv-03569-VKD <br><br> **INTERIM ORDER RE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** <br><br> Re: Dkt. No. 20 |

Plaintiff Angry Chickz, Inc. ("Angry Chickz") moves for entry of default judgment against defendants Bosphorus Trade, Inc. ("Bosphorus") and Salih Inci. Dkt. No. 20. Neither defendant has appeared and the Clerk has entered default against them. Dkt. No. 18. The Court previously found this matter suitable for determination without oral argument. *See* Civil L.R. 7-1(b); Dkt. Nos. 24, 27.

Having reviewed Angry Chickz's complaint, motion for default judgment, and supporting documents, it appears that Angry Chickz is entitled to judgment in its favor on liability. However, Angry Chickz seeks injunctive relief that does not comply with Rules 65(d) and 54(c) of the Federal Rules of Civil Procedure. Accordingly, the Court issues this interim order regarding the merits of Angry Chickz's motion and requests a further submission regarding the proposed injunction.

**I.    BACKGROUND**

According to the complaint, Angry Chickz owns, operates, and franchises a chain of "Angry Chickz" restaurants serving Nashville hot chicken. Dkt. No. 1 ¶¶ 10-11. Two of these restaurants are located in San Jose. *Id.* ¶ 12.

1   Defendant Bosphorus operates "The Angry Hot Chicken," a restaurant which also serves
2   Nashville hot chicken. *Id.* ¶ 24. Bosphorus's restaurant is also located in San Jose. *Id.*
3   Defendant Inci is Bosphorus's chief executive officer and a resident of Milpitas. *Id.* ¶ 4.

4   Angry Chickz alleges that defendants have copied many distinctive features of its business
5   and asserts claims against defendants for trademark and trade dress infringement under section
6   43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under California common law. *Id.* ¶¶ 39-58.
7   Specifically, Angry Chickz alleges that its restaurants are characterized by a distinctive menu,
8   décor, and design, and that its restaurants are strongly associated with certain design and word
9   marks. *See id.* ¶¶ 10-23. Angry Chickz also alleges that defendants' restaurant includes many
10  elements that are confusingly similar to the distinctive features of Angry Chickz's restaurants. *See*
11  *id.* ¶¶ 24-38.

12  Angry Chickz says that, since 2018, it has spent "considerable time, effort and money"
13  promoting its "Angry Chickz" brand on restaurant signage, packaging and promotional materials,
14  on its website (www.angrychickz.com), and on social media platforms like Facebook, Instagram,
15  and Yelp. *Id.* ¶ 22. According to Angry Chickz, its trademarks and trade dress have "gained
16  substantial fame among consumers of Nashville hot chicken-style food" and that "[a]s a result, the
17  ANGRY CHICKZ marks are easily recognized, well-known, and famous in California, Nevada,
18  [and] Arizona." *Id.* ¶ 23.

19  Angry Chickz claims the name of defendants' restaurant, "The Angry Hot Chicken," is
20  confusingly similar to the "Angry Chickz" name for its own restaurants. *Id.* ¶ 32. It also alleges
21  that defendants display the "Angry Hot Chicken" name and branding in their restaurant, on
22  publicity and promotional materials, on their website (www.theangryhotchicken.com), and on
23  social media platforms like Facebook, Instagram, and Yelp. *Id.* ¶ 25.

24  In addition, Angry Chickz alleges that defendants copied distinctive features of its menu.
25  First, like Angry Chickz, defendants sell a chicken with French fries combination as "Angry
26  Fries" and a chicken with macaroni and cheese combination as "Angry Mac." *Id.* ¶¶ 18-19, 29-30,
27  33. Second, like Angry Chickz, defendants' menu includes the same four combinations of chicken
28  and sides. *Id.* ¶ 14 (Angry Chickz combos: "(1) two hot chicken sliders with coleslaw, pickles,

United States District Court
Northern District of California

and French fries; (2) two hot chicken tenders over white bread with pickles and French fries; (3) one hot chicken slider and one chicken tender over white bread, coleslaw, pickles, and French fries; and (4) two hot chicken tenders over rice topped with coleslaw and pickles."), ¶ 26 (The Angry Hot Chicken combos: "(1) two chicken tenders served on white bread with French fries and pickles; (2) two chicken sliders served with coleslaw, pickles, and French fries; (3) one chicken tender and one chicken slider served with French fries; and (4) two chicken tenders served with mac and cheese and French fries."). Third, Angry Chickz's menu allows customers to select from one of six playfully named levels of "heat" or spiciness, represented by a stylized image of a thermometer and the words "(1) Country (No Heat); (2) Mild (Light Spice); (3) Medium (Perfect Heat); (4) Hot (Feel The Burn); (5) X-Hot (Call 911); and (6) Angry (Sign A Waiver)." *Id.* ¶ 15. Similarly, the Angry Hot Chicken's menu also includes a stylized image of a thermometer with five levels of "heat" accompanied by the words "(1) Country (No Heat), (2) Medium (Light Spice), (3) Hot Shot (Perfect Heat), (4) Extra Hot (Feel The Burn), and (5) Reaper (Sign Waiver)." *Id.* ¶ 28. Angry Chickz's complaint includes photographs of its menus and defendants' menus. *Id.* ¶ 14 (Angry Chickz menu); ¶¶ 26, 28 (The Angry Hot Chicken menu).

Angry Chickz also claims that defendants' restaurant shares many of the same physical design elements that characterize its own restaurants. It alleges that all Angry Chickz restaurants feature a white, black and red color scheme, with murals of cartoon chickens, wood-grained tables with red metal chairs, and a partially open kitchen, and that The Angry Hot Chicken's décor features these same design elements. *Id.* ¶¶ 17, 31. Additionally, Angry Chickz alleges that employees at both restaurants wear black shirts with the restaurant's logo, black pants, and a red or black apron. *Id.* ¶¶ 17, 21, 31.

Angry Chickz alleges that it has used the names, marks, menu, décor, and other design elements described above in commerce since 2018. *Id.* ¶¶ 10-23.

In November of 2022, Angry Chickz's counsel sent a letter to defendants, asking that they "alter their trade name and branding" to avoid infringing on Angry Chickz's trademarks. Dkt. No. 1 ¶ 36; Dkt. No. 20-1 ¶¶ 5-6, Ex. 2. However, Angry Chickz's attempts to resolve this dispute without litigation failed, and it filed the complaint in this action on July 18, 2023. Dkt. No. 1.

3

Bosphorus and Mr. Inci were served on September 16 and 18, 2023, respectively. Dkt. Nos. 9, 10. Angry Chickz later stipulated to an extension of defendants' deadline to respond to the complaint to October 24, 2023. Dkt. No. 13. Neither defendant filed a timely response to the complaint, and on November 2, 2023, at Angry Chickz's request, the Clerk entered default against both defendants. Dkt. Nos. 16, 18.

On January 2, 2024, Angry Chickz filed a motion for entry of default judgment. Dkt. No. 20. Defendants did not file a response. Thereafter, the Court deemed the matter suitable for resolution without oral argument. Dkt. No. 24. On February 8, 2024, Mr. Inci filed a motion to reschedule the hearing to give him time to "find an attorney/legal support." Dkt. No. 25. The Court denied the motion to reschedule the hearing, having already concluded that the matter could be resolved without oral argument. Dkt. No. 27. The Court has received no further communication from either defendant.

## II.   LEGAL STANDARD

The Clerk must enter default against a party who fails to plead or otherwise defend an action. Fed. R. Civ. P. 55(a). After entry of default, a court may, in its discretion, enter default judgment. Fed. R. Civ. P. 55(b)(2);[1] *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In deciding whether to enter default judgment, a court may consider the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) ("*Eitel* factors"). In considering these factors, all factual allegations in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987). The court may also hold

---

[1] "A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared." Fed. R. Civ. P. 55(b)(2). There are no such issues presented here. Nor is there any indication that Mr. Inci is a person in military service. *See* 50 U.S.C. § 3931.

4

a hearing to conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2).

### III. DISCUSSION

#### A. Jurisdiction and Service of Process

When a default judgment is sought, the court "has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) (cleaned up). "The party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986).

The Court has subject matter jurisdiction over Angry Chickz' Lanham Act claim pursuant to 28 U.S.C. §§ 1331, 1338 and supplemental jurisdiction over its state law claim pursuant to 28 U.S.C. § 1367. It also has personal jurisdiction over Bosphorus, a California corporation, and Mr. Inci, a California resident. *See* Dkt. No. 1 ¶¶ 3-4.

A default judgment entered against a defendant who was improperly served is void. *See S.E.C. v. Internet Sols. For Bus. Inc.*, 509 F.3d 1161, 1165 (9th Cir. 2007). Here, both Bosphorus and Mr. Inci were served pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 9, 10.

#### B. *Eitel* Factors

For the reasons discussed below, the *Eitel* factors weigh in favor of entering default judgment on both of Angry Chickz' claims.

##### 1. The possibility of prejudice to Angry Chickz

The first *Eitel* factor concerns whether the plaintiff would suffer prejudice if default judgment is not entered, and whether such potential prejudice to the plaintiff weighs in favor of granting default judgment. *Eitel*, 782 F.2d at 1471; *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D. Cal. 2010). Given defendants' failure to respond to the complaint and otherwise participate in the litigation, Angry Chickz would likely be left without recourse against them on its trademark and trade dress infringement claims if the Court does not enter default judgment. The possibility of prejudice to Angry Chickz therefore weighs in favor of granting a default judgment.

### 2. The merits of Angry Chickz's claims and the sufficiency of the complaint

The second and third *Eitel* factors concern the merits of the plaintiff's claims and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471. The Ninth Circuit suggests that these factors require that a plaintiff state a claim for relief on which it may recover. *Kloepping v. Fireman's Fund*, No. 94-cv-2684, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)). Angry Chickz asserts claims for the infringement of unregistered trademarks and trade dress under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under California common law. *See* Dkt. No. 20 at 4.

#### a. Claim 1: Lanham Act

Angry Chickz's first claim for relief challenges defendants' use of Angry Chickz's unregistered marks and trade dress as "trademark infringement" in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). While Angry Chickz owns two registered marks for an image of a yellow cartoon chicken doing a "dab" dance move (Dkt. No. 1 ¶ 20 (citing U.S. Reg. Nos. 6685792, 6742953)), the complaint does not allege that defendants infringe these marks. Accordingly, the Court construes claim 1 as a claim for false designation of origin with respect to Angry Chickz's unregistered trademarks and trade dress. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 30 (2003) (observing that section 43(a) of the Lanham Act "create[es] a federal cause of action for traditional trademark infringement of unregistered marks"); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (noting that this provision protects "not just word marks, . . . but also 'trade dress'").

To establish a claim for false designation of origin under the Lanham Act, with respect to an unregistered mark, a plaintiff must show that the defendant (1) used in commerce (2) a word or mark or other designation, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or origin of the goods or services in question. *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1170 (N.D. Cal. 2015) (citing *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007); *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980)). Similarly, to establish a claim false designation of origin, with respect to unregistered trade dress, a plaintiff must show "(1) that its claimed dress is

6

nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987)).

"[R]estaurants and similar establishments may have a total visual appearance that constitutes protectable trade dress." *Id.*; *see also Fuddruckers*, 826 F.2d at 841 ("[A] restaurant's décor, menu, layout and style of service may acquire the source-distinguishing aspects of protectable trade dress."). Because "[t]rade dress is the composite tapestry of visual effects," courts must "focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create" when evaluating a trade dress claim. *Clicks Billiards*, 251 F.3d at 1259 (emphasis in original).

To show likelihood of confusion, a plaintiff must demonstrate that the relevant audience is likely to be confused as to the origin of the goods or services bearing the marks or trade dress in question. *See Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979), the Ninth Circuit identified eight factors that are relevant to the likelihood of confusion analysis: (1) strength of the plaintiff's mark or trade dress; (2) relatedness of the goods or services; (3) similarity of the mark or trade dress; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark, and; (8) likelihood of expansion of the product lines or services. *Id.* "It is well established that this multi-factor approach must be applied in a flexible fashion. The *Sleekcraft* factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist." *Rearden*, 683 F.3d at 1209 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011)). "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Id.*; *see also Network Automation*, 638 F.3d at 1142, 1145, 1148-49, 1153-54;

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

#### i.      Name and marks

Angry Chickz asserts that defendants' use of the name "The Angry Hot Chicken" and the use of "Angry Fries" and "Angry Mac" are confusingly similar to Angry Chickz's own name and "angry" marks.  *See* Dkt. No. 1 ¶¶ 11-33, 39-44.

As alleged in the complaint, defendants provide the same products and services (a Nashville hot chicken restaurant, hot chicken served with French fries, and hot chicken served with mac and cheese), as Angry Chickz, and use extremely similar—if not identical—marks ("The Angry Hot Chicken," "Angry Fries," and "Angry Mac") to refer to these products.  *Id.* ¶¶ 11-33, 39-44.  Moreover, both Angry Chickz and defendants operate in the same geographic area.  *See Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989-90 (9th Cir. 1995) (finding likelihood of confusion in case of identically named stores in same region); *Brookfield*, 174 F.3d at 1054 (noting that other courts have permitted concurrent use of the same mark by restaurants in different states).  While Angry Chickz's complaint does not contain allegations bearing on some of the other *Sleekcraft* factors, like evidence of actual confusion or degree of purchaser care, Angry Chickz's allegations of likelihood of confusion are sufficient to support a claim for false designation of origin with respect to its name and the "angry" marks.

#### ii.     Trade dress

Angry Chickz identifies the following elements of its trade dress in its complaint: (1) a menu organized into four combos, Dkt. No. 1 ¶ 14; (2) offering food at six levels of spiciness, conveyed on a stylized thermometer with playful names ("(1) Country (No Heat); (2) Mild (Light Spice); (3) Medium (Perfect Heat); (4) Hot (Feel The Burn); (5) X-Hot (Call 911); and (6) Angry (Sign A Waiver)"), *id.* ¶¶ 15-16; (3) walls decorated with "solid white, black, and red colors" and "cartoonish murals, often incorporating themes of cartoon chickens and an appreciation for Nashville hot chicken cuisine," *id* ¶ 17; (4) a "painted black ceiling" and "wood-grained styled flooring," *id.*; (5) "[l]ight-colored wood dining tables" and "red metal chairs," *id.*; (6) a "clean and simple menu," including images of the four combos and the stylized thermometer, as well as "Angry Fries" and "Angry Mac," *id.* ¶¶ 14-17; (7) a partially open kitchen area, *id.* ¶ 17; and (8)

1  staff members wearing a uniform of a black "Angry Chickz" branded t-shirt, black pants and a red
2  or black apron, *id.* ¶¶ 17, 21.  Angry Chickz alleges that its trade dress is nonfunctional and that it
3  is inherently distinctive and/or has acquired distinctiveness.  *Id.* ¶¶ 40-41.

4      A design element or feature is functional when it is "essential to the use or purpose of the
5  article or if it affects the cost or quality of the article."  *Clicks Billiards*, 251 F.3d at 1258 (quoting
6  *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 165 (1995)).  Courts must "examine
7  trade dress as a whole to determine its functionality."  *Fuddruckers*, 826 F.2d at 842.
8  "[F]unctional elements that are separately unprotectable can be protected together as part of a
9  trade dress."  *Id.*  In the context of restaurants and similar establishments, the Ninth Circuit has
10 stated that the functionality analysis centers on whether the plaintiff's "particular integration of
11 elements leaves a multitude of alternatives to the [industry in question] that would not prove
12 confusingly similar to its trade dress."  *Clicks Billiards*, 251 F.3d at 1261 (cleaned up).  While
13 certain elements of Angry Chickz's alleged trade dress, considered separately, might be functional
14 in the context of a Nashville hot chicken restaurant (e.g., specifying levels of "heat"), the
15 combination of design elements described in the complaint is not, and leaves available to other
16 competing establishments a "multitude of [dissimilar] alternatives" *Id.*; *see also Kreation Juicery,*
17 *Inc. v. Shekarchi*, No. 14-cv-658-DMG (ASx), 2014 WL 7564679, at *10 (C.D. Cal. Sept. 17,
18 2014) ("Kreation's trade dress is nonfunctional since the collection of its elements—reclaimed
19 wood and a living wall—does not have to be used by others in order to compete in the healthy
20 Mediterranean food business.").

21     Trade dress is capable of being protected if it "*either* (1) is inherently distinctive *or* (2) has
22 acquired distinctiveness through secondary meaning."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505
23 U.S. 763, 769 (1992) (emphasis in original).  "'The trade dress of a product or service attains
24 secondary meaning when the purchasing public associates the dress with a particular source.'"
25 *Clicks Billiards*, 251 F.3d at 1262 (quoting *Fuddruckers*, 826 F.2d at 843).  While Angry Chickz's
26 restaurant décor, considered as a combination of the elements described above, may not be
27 inherently distinctive, Angry Chickz plausibly alleges that since the first use in commerce in 2018
28 customers have come to associate the décor with Angry Chickz and its restaurants.  *See* Dkt. No. 1

¶ 23 ("Due to the widespread availability of ANGRY CHICKZ restaurants, the quality of Angry Chickz' restaurants and cuisine, and Angry Chickz' widespread and comprehensive advertising and publicity campaigns, the ANGRY CHICKZ marks have gained substantial fame among consumers of Nashville hot chicken-style food."); *see also id.* ¶¶ 10-22.

As alleged in the complaint, defendants' restaurant features the following elements: (1) a menu organized into four combos, *id.* ¶ 26; (2) offering food at five levels of spiciness, conveyed on a stylized thermometer ("(1) Country (No Heat), (2) Medium (Light Spice), (3) Hot Shot (Perfect Heat), (4) Extra Hot (Feel The Burn), and (5) Reaper (Sign Waiver)"), *id.* ¶ 28; (3) walls decorated with "white, black, and red colors interspersed with cartoonish murals, often incorporating themes of cartoon chickens and an appreciation for Nashville hot chicken cuisine," *id.* ¶ 31; (4) a "painted black ceiling" and "wood-grained styled flooring," *id.*; (5) "[l]ight-colored wood dining tables" and "the exact same style of red metal chairs used in Angry Chickz' restaurants," *id.*; (6) a menu including images of the four combos and the stylized thermometer, *id.* ¶¶ 26, 28, 31; (7) a partially open kitchen area, *id.* ¶ 31; and (8) staff members wearing a uniform of a branded black t-shirt, black pants, and a black or red apron, *id.*

Angry Chickz argues that defendants' use of this combination of design elements and features is confusingly similar to its trade dress. *Id.* ¶ 34. Several of the *Sleekcraft* factors strongly support this contention. The parties' goods are closely related. *Sleekcraft*, 599 F.2d at 348. Their menus are nearly identical, offering Nashville hot chicken with similar combinations of sides and similar levels of spice. Dkt. No. 1 ¶¶ 14-16, 26, 28; *Shawarma Stackz LLC v. Jwad*, No. 21-cv-01263-BAS-BGS, 2021 WL 5827066, at *17 (S.D. Cal. Dec. 8, 2021) (restaurants' services were related when their menus "include[d] [the] same dishes with identical names and descriptions"). The overall visual appearance of the restaurants is also very similar. *Sleekcraft*, 599 F.2d at 348. Both restaurants use similar graphic representations of different levels of "heat" or spiciness, i.e., a stylized thermometer and decorations of cartoon chickens, and they both have very similar color schemes and furnishings. In addition, the parties use the same marketing channels. *Sleekcraft*, 599 F.2d at 348. Both advertise online on their own websites and on Facebook, Instagram, and Yelp. Dkt. No. 1 ¶¶ 22, 25; *see also Shawarma Stackz*, 2021 WL

1  5827066, at *18 (marketing channels were convergent when "a consumer searching online for
2  [plaintiff's restaurant] can confuse it with [defendant's restaurant]"). Additionally, both parties
3  operate restaurants in the same geographic area, San Jose. Dkt. No. 1 ¶¶ 12, 14; *see also*
4  *Brookfield*, 174 F.3d at 1054.[2]

* * *

Based on the record presented, the Court concludes that the second and third *Eitel* factors weigh in favor of granting a default judgment to Angry Chickz on its Lanham Act claim.

### b.   Claim 2:   Common law trademark infringement

Angry Chickz's California common law trademark infringement claim is "subject to the same test" as its false designation of origin claim. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008); *see also Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("[The Ninth] Circuit has consistently held that state common law claims of unfair competition . . . are 'substantially congruent' to claims made under the Lanham Act.") (cleaned up); *Mallard Creek Indus., Inc. v. Morgan*, 56 Cal. App. 4th 426, 434 (1997) (discussing standard for trademark infringement under California law).

Accordingly, for the reasons described in the Court's discussion of the Lanham Act claim, the Court concludes that Angry Chickz has sufficiently alleged a common law trademark infringement claim and that the second and third *Eitel* factors weigh in favor of granting a default judgment in its favor as to this claim as well.

### 3.   The amount of money at stake

The fourth *Eitel* factor concerns the amount of money at stake in the litigation. *Eitel*, 782 F.2d at 1471. Here, Angry Chickz seeks only injunctive relief and an award of attorneys' fees. *See* Dkt. No. 20-2 (proposed judgment). Courts generally find that this factor weighs in favor of a default judgment when, as here, plaintiffs seek injunctive relief to protect intellectual property rights, accompanied by a request for attorneys' fees. *See, e.g.*, *Vietnam Reform Party v. Viet Tan -*

---

[2] In its motion, Angry Chickz argues that defendants intentionally copied its trademarks and trade dress. *See* Dkt. No. 20-1 ¶¶ 3-4. However, it did not include factual allegations of intentional copying in its complaint.

*Vietnam Reform Party*, 416 F. Supp. 3d 948, 970 (N.D. Cal. 2019); *Levi Strauss & Co. v. Neverland Online Pty Ltd.*, No. 19-cv-04178-SBA (JCS), 2020 WL 6931065, at *9 (N.D. Cal. June 8, 2020).

This factor weighs in favor of granting default judgment to Angry Chickz.

#### 4. Possibility of a dispute concerning material facts

The fifth *Eitel* factor addresses the possibility of a dispute concerning material facts. *Eitel*, 782 F.2d at 1471-72. Where a plaintiff has filed a well-pleaded complaint alleging the elements necessary to establish its claims, and the Clerk has entered default upon the defendant's failure to answer, a court may find the possibility of a dispute as to material facts is unlikely. *Fudy Printing Co. v. Aliphcom, Inc.*, No. 17-cv-03863-JSC, 2019 WL 2180221, at *5 (N.D. Cal. Mar. 7, 2019). Here, Angry Chickz has filed a well-pleaded complaint for false designation of origin under section 43(a) of the Lanham Act and trademark infringement under California common law. Defendants have done nothing to contest the allegations of the complaint.

This factor weighs in favor of granting default judgment to Angry Chickz.

#### 5. Possibility of excusable neglect

The sixth *Eitel* factor concerns whether the default was due to excusable neglect. *Eitel*, 782 F.2d at 1471. Where a defendant "blatant[ly] attempts to resist service" or fails to appear after being properly served, no excusable neglect will be found. *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016). However, a defendant who "reasonably believe[s]" she is not required to answer a suit may be excused. *Eitel*, 782 F.3d at 1472.

Here, the record shows that Mr. Inci has known of this lawsuit since it was filed and has been aware of the claims underlying it for over a year. *See* Dkt. No. 20-1, Exs. 2, 5, 7, 8. During that time, he appears to have asked Angry Chickz for additional time to make changes to the restaurant and/or obtain counsel on multiple occasions. *See id.*, Exs. 5, 8, 10; Dkt. No. 13; Dkt. No. 25. There is no indication that defendants have made any changes to their restaurant or that they have taken any other action to address Angry Chickz's complaint.

Accordingly, this factor weighs in favor of default judgment.

12

### 6. Policy favoring decisions on the merits

The seventh *Eitel* factor requires consideration of the "strong policy favoring decisions on the merits" embodied in the federal rules. *Eitel*, 782 F.2d at 1472. While the Court prefers to decide matters on the merits, defendants' failure to participate in this litigation makes that impossible. *See Ridola v. Chao*, No. 16-cv-02246-BLF, 2018 WL 2287668 at *13 (N.D. Cal. May 18, 2018) ("Although federal policy favors decision on the merits, Rule 55(b)(2) permits entry of default judgment in situations, such as this, where a defendant refuses to litigate."). Default judgment therefore is Angry Chickz's only recourse. *See United States v. Roof Guard Roofing Co, Inc.*, No. 17-cv-02592-NC, 2017 WL 6994215, at *3 (N.D. Cal. Dec. 14, 2017) ("When a properly adversarial search for the truth is rendered futile, default judgment is the appropriate outcome.").

Accordingly, this factor weighs in favor of default judgment.

### C. Remedies

Angry Chickz asks the Court to enter a permanent injunction barring defendants from infringing on its trademarks and trade dress. Dkt. No. 20 at 18-19. It also asks the Court to find that it is entitled to attorneys' fees under the Lanham Act, although it reserves its request for fees for a post-judgment application. *Id.* at 20-21. Additionally, Angry Chickz argues that Bosphorus and Mr. Inci should be held jointly and severally liable for any relief obtained. *Id.* at 17-18.

#### 1. Injunctive Relief

The Court first considers whether Angry Chickz is entitled to injunctive relief before turning to the specific injunction requested.

##### a. Angry Chickz's entitlement to injunctive relief

The Lanham Act grants the Court "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable . . . to prevent a violation under [15 U.S.C. § 1125(a)]". 15 U.S.C. § 1116(a). To obtain injunctive relief, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

13

> hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). With respect to irreparable injury, the Lanham Act provides that:

> A plaintiff seeking [an] injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation [of 15 U.S.C. § 1125(a)] in the case of a motion for a permanent injunction . . .

15 U.S.C. § 1116(a); *see also Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1005 (9th Cir. 2023). Because Angry Chickz has stated a claim for violation of the Lanham Act and because the *Eitel* factors weigh in favor granting default judgment, as discussed above, it is entitled to a rebuttable presumption of irreparable harm. *Y.Y.G.M. SA*, 75 F.4th at 1007 (quoting *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)) ("'[L]oss of control over business reputation and damage to goodwill could constitute irreparable harm.'"). Moreover, given the nature of the violation, Angry Chickz appears to have no adequate remedy at law for defendants' continuing use of confusingly similar marks and trade dress. *See Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."). While defendants likely will be required to incur some expense if required to stop using Angry Chickz's trademarks and trade dress, this "hardship" does not tip the balance in their favor. *See, e.g.*, *Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd.*, No. 20-cv-07405-JSC, 2021 WL 4461601, at *10 (N.D. Cal. Sept. 22, 2021) ("[T]he only apparent hardship to Defendants is ceasing the unlawful conduct, which is not a hardship for purposes of permanent injunction analysis."). And finally, an injunction would serve "the general public's interest in protecting trademark holders' rights." *Id*. at *10.

Accordingly, the Court concludes that Angry Chickz has shown that it is entitled to injunctive relief under the Lanham Act.

### b. Scope of injunctive relief

Injunctive relief "is a precise tool to fix a precise injury," and "should be 'narrowly

14

tailored' to remedy the specific harm a plaintiff has identified 'rather than to enjoin all possible breaches of the law.'" *Facebook, Inc. v. OnlineNIC, Inc.*, No. 19-cv-07071-SI (SVK), 2022 WL 2289067, at *17 (N.D. Cal. Mar. 28, 2022) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)). Rule 65(d) requires courts to state the terms of the injunction specifically and to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *Id.* (citing Fed. R. Civ. P. 65(d)(1)(B)-(C)). For an injunction against trademark or trade dress infringement to be enforceable, it must "identify the [marks or trade dress] with sufficient specificity" to give defendants "fair notice" of its requirements. *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1133 (9th Cir. 2006). Moreover, Rule 54(c) requires that default judgments "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

In its motion, Angry Chickz requests a permanent injunction ordering defendants to:

1) "[refrain from the] use of the terms "Angry Hot Chicken," "Angry Mac", "Angry Fries," or any confusingly similar derivatives thereof in any form, as a trade name, trademark, service mark, or logo in connection with the sale, offering for sale, or promotion of restaurant services and/or food items in any manner that is likely to cause consumer confusion, in a manner disparaging to Angry Chickz, or in any manner that would otherwise unfairly compete with Angry Chickz' trade or business;"

2) "[refrain from the] use of the trade dress associated with Angry Chickz' in-store restaurant locations and online ordering platforms, as alleged in the Complaint, or any confusingly similar derivatives thereof, in any form, in connection with the sale, offering for sale, or promotion of restaurant services and/or food items in any manner that is likely to cause consumer confusion, in a manner disparaging to Angry Chickz, or in any manner that would otherwise unfairly compete with Angry Chickz' trade or business;"

3) "cease [within 90 days of judgment] their use of the terms "Angry Hot Chicken," "Angry Mac", and "Angry Fries" as a trade name, trademark, service mark, or logo, as well as the distinctive elements of the trade dress associated with Angry Chickz' in-store restaurant locations and online ordering platforms, as alleged in the Complaint, or any confusingly similar derivatives thereof, in any form, except as necessary to use those marks to point or direct customers or vendors to Defendants' new website with its new business name; [and]"

4) "cease [within 90 days of judgment] the use of any Internet

15

>domain or other social media address that includes "Angry Hot Chicken" or any confusingly similar derivation. Promptly, and in compliance with this Permanent Injunction, Defendants shall cooperate with Angry Chickz to transfer the "theangryhotchicken.com" domain to Angry Chickz' control, and shall terminate the use of any other similar domains it holds as well as any other social media address making use of "Angry Hot Chicken," or any derivation thereof[.]"

Dkt. No. 20-2 ¶ 4.

The proposed injunction suffers from several defects. First, it refers to the "trade dress associated with Angry Chickz' in-store restaurant locations and online ordering platforms, *as alleged in the Complaint*." *Id.* (emphasis added). This violates Rule 65(d)(1)(C)'s specific requirement that injunctions describe their requirements without reference to the complaint or other documents. *See* Fed. R. Civ. P. 65(d)(1)(C).

Second, the proposed injunction does not "clearly identif[y] and describe[]" the elements of the trade dress that will be protected by the injunction. *Reno Air Racing*, 452 F.3d at 1133. For an injunction to be enforceable, it must list and describe the elements of Angry Chickz's trade dress with sufficient specificity to clearly define defendants' obligations. *See id.* at 1134 ("The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of trademark law. The 'specific terms' and 'reasonable detail' mandated by Rule 65(d) should be understood by the lay person, who is the target of the injunction."); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:13 (5th ed. 2022) ("A court order granting an injunction should clearly specify the exact actions which are forbidden to the defendant [and] should be phrased in terms of objective actions, not legal conclusions."). Phrases such as "confusingly similar thereto" can be acceptable, but the trademarks or trade dress to which they refer must be clearly identified in the injunction. *See Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*, 281 F. Supp. 3d 967, 979-80 (C.D. Cal. 2017).

Third, the proposed injunction is not "tailored to eliminate *only the specific harm alleged*." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 839-40 (9th Cir. 2014) (quoting *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012)) (emphasis in original). "Injunctive relief under the Lanham Act must be narrowly tailored to the scope of the issues tried in the case." *Skydive Arizona*, 673 F.3d at 1116 (citing *Starter Corp. v. Converse, Inc.*,

16

170 F.3d 286, 290 (2d Cir. 1999)).  Angry Chickz seeks to enjoin defendants from using its trademarks and trade dress "in a manner disparaging to Angry Chickz, or in any manner that would otherwise unfairly compete with Angry Chickz' trade or business."  Dkt. No. 20-2 ¶ 4.  However, Angry Chickz's complaint does not include specific allegations of disparagement or unfair competition, beyond the allegations of trademark and trade dress infringement described above, nor does the injunction specify the acts that would be deemed "disparaging" or "unfairly competitive."  *See Skydive Arizona*, 673 F.3d at 1116 ("Courts should not enjoin conduct that has not been found to violate any law.").

Fourth, the portion of the proposed injunction that requires defendants to transfer the www.theangryhotchicken.com domain to Angry Chickz violates Rule 54(c), as such relief is not requested in the complaint.  *See* Dkt. No. 1 at 14 (prayer for relief).  Further, it is not clear whether a transfer of the domain to Angry Chickz is warranted in these circumstances, as that domain could potentially be used in connection with a business that does not compete with Angry Chickz's business.

Because the proposed injunction is overbroad and insufficiently specific, and does not otherwise comply with Rule 65(d) or Rule 54(c), Angry Chickz is not entitled to a judgment incorporating this specific injunctive relief.

### 2. Attorneys' Fees

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "'[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'"  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstance."  *Octane Fitness*, 572 U.S. at 554.  In making this determination, "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular

circumstances to advance considerations of compensation and deterrence'" are among the factors a court may consider when making this determination.'" *SunEarth*, 839 F.3d at 1181 (quoting *Octane Fitness*, 572 U.S. at 554 n.6). A party must prove their entitlement to fees by a preponderance of the evidence. *Id.*

Angry Chickz contends that this is an exceptional case because of defendants' failure to respond to pre-litigation efforts to resolve this matter, failure to appear in this case, and continued infringement of its trademarks and trade dress. *See* Dkt. No. 20 at 20-21. Other courts in this district have awarded attorneys' fees where the "infringement is willful and the defendant fails to appear to defend themselves." *Sream, Inc. v. Sahebzada*, No. 18-cv-05673-DMR, 2019 WL 2180224, at *10-11 (N.D. Cal. Mar. 6, 2019); *see also Tech. LED Intell. Prop., LLC v. Aeon Labs LLC*, No. 18-cv-01847-JSC, 2019 WL 8723847, at *6 (N.D. Cal. Dec. 2, 2019); *ADG Concerns, Inc. v. Tsalevich LLC*, No. 18-cv-00818-NC, 2018 WL 4241967, at *13-14 (N.D. Cal. Aug. 31, 2018) (stating the same).

On the record presented, defendants conduct appears to be objectively unreasonable. Defendants have been aware of Angry Chickz's allegations of infringement since at least November of 2022. Dkt. No. 20-1 ¶¶ 5-6, Ex. 2. There is no indication that they have made any changes to their restaurant, even after indicating they would do so, *see id.* ¶¶ 10-11, Ex. 5, and they have entirely failed to defend the action. Defendants' continued infringement appears to have been willful.

Accordingly, the Court concludes that Angry Chickz's allegations and supporting evidence show that this is an "exceptional" case within the meaning of the Lanham Act and that Angry Chickz may recover reasonable attorneys' fees from defendants, subject to submission of an appropriate post-judgment motion.

### 3. Joint and Several Liability

Angry Chickz asks the Court to hold defendant Inci personally liable on any judgment, jointly and severally with defendant Bosphorus. Dkt. No. 20 at 17-18. "A 'corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own

1  behalf.'" *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) (quoting

2  *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996)).  Personal liability

3  is often found "where the defendant was the 'guiding spirit' behind the wrongful conduct, or the

4  'central figure' in the challenged corporate activity." *Id.* (quoting *Davis v. Metro Prods., Inc.*, 885

5  F.2d 515, 523 n.10 (9th Cir. 1989)).

6    Angry Chickz alleges in its complaint that Mr. Inci, as Bosphorus's CEO, personally

7  "authorized and/or directed" Bosphorus's infringing conduct.  Dkt. No. 1 ¶¶ 45, 55.  All of Angry

8  Chickz's communications with defendants regarding this matter appear to have been with Mr.

9  Inci.  *See* Dkt. No. 20-1.  The evidence adduced by Angry Chickz plausibly establishes that Mr.

10  Inci directed and participated in Bosphorus's infringing conduct and, thus, he may be held

11  personally liable.  *See Comm. for Idaho's High Desert*, 92 F.3d at 823-24; *Genomma Lab*

12  *Internacional, S.A.B. de C.V. v. Mprezas, Inc.*, No. 22-cv-01759-WHO, 2023 WL 8811808, at *7-

13  8 (N.D. Cal. Dec. 20, 2023) (collecting cases where corporate officers were found personally

14  liable for trademark infringement or unfair competition).

15    Thus, both defendants would be jointly and severally liable for any relief that is ultimately

16  ordered.  *See Facebook, Inc. v. Power Ventures, Inc.,* No. 08-cv-5780-LHK, 2013 WL 5372341, at

17  *9 (N.D. Cal. Sept. 25, 2013).

18  **IV.  CONCLUSION**

19    While it appears that Angry Chickz has established its entitlement to a default judgment

20  against defendants on the merits, it is not entitled to all of the specific relief it requests.

21  Accordingly, the Court directs Angry Chickz to file a supplemental memorandum and any

22  necessary supporting papers addressing the deficiencies identified in this interim order.  *See Tech.*

23  *LED Intell. Prop., LLC*, 2019 WL 8723847, at *2 (addressing entitlement to default judgment and

24  remedies in separate orders).  This submission shall be filed by **July 1, 2024**, unless Angry Chickz

25  requests additional time.

26    Angry Chickz shall promptly serve defendants with a copy of this order.

27  //

28  //

**IT IS SO ORDERED.**

Dated: June 10, 2024

*Virginia K. DeMarchi*
VIRGINIA K. DEMARCHI
United States Magistrate Judge